IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| JONATHAN BARR, | ) | |
| | ) | |
| Plaintiff, | ) | No. |
| | ) | |
| v. | ) | |
| | ) | |
| Illinois State Police Officers TASSO J. | ) | |
| KACHIROUBAS, JOHN MEDUGA, | ) | |
| WILLIE DAVIS, JAMES KIZART, | ) | |
| JESSE GARCIA, RICHARD | ) | |
| PACKERT, Former Dixmoor Lt. | ) | |
| JOSEPH FALICA, JR., Former | ) | |
| Dixmoor Deputy Chief of Police | ) | |
| MICHAEL R. MORGAN, Former | ) | |
| Dixmoor Chief of Police NICHOLAS | ) | |
| GRAVES, VILLAGE OF DIXMOOR, | ) | |
| As-yet Unknown Current or Former | ) | |
| Employees of the Illinois State Police, | ) | |
| and As-yet Unknown Current or | ) | |
| Former Employees of the Village of | ) | |
| Dixmoor, Illinois, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff, JONATHAN BARR, by his attorneys, Neufeld Scheck & Brustin, LLP, and the People's Law Office, hereby alleges as follows:

### Introduction

1.     Jonathan Barr spent over 18 years in prison for a crime he did not commit.

2.     Along with his co-defendants, James Harden, Robert Taylor, Robert Veal, and Shainne Sharp, Jonathan was wrongfully convicted for allegedly raping and murdering his 14-year-old friend and middle-school classmate, Cateresa Matthews; he was sentenced to 85 years in prison. Jonathan was 14 years old at the time Ms. Matthews was murdered; his four co-defendants were no older than 16.

3.     None of the teenagers had anything to do with this horrible crime. Ms. Matthews was actually raped and murdered by 33-year-old convicted sex-offender Willie Randolph, a stranger to Ms. Matthews who lived about a mile from where her body was found in Dixmoor, Illinois, had raped another young woman in the exact field where Ms. Matthews' body was found, and called the Dixmoor Police Department himself to report the body. But despite the evidence implicating Randolph, Defendant Illinois State Police and Dixmoor Police Officers failed to pursue Randolph at the time of the crime and he was not brought to justice. Tragically, Randolph went on to commit a number of other violent crimes throughout the Chicago area.

4.     Instead, when Defendant Officers found themselves almost a year after the crime and still without an arrest, they created a false case against Jonathan, his brother James Harden, and the other teens. Defendant Officers focused first on Robert Veal, a 15-year-old special education student whose developmental disabilities were so severe that he had been removed from his public school. Defendant Officers ultimately coerced and fabricated confessions from three of the

young teenagers—Veal, Sharp, and Taylor—implicating themselves, Jonathan, and his brother James Harden. Although Defendant Officers attempted to coerce Jonathan Barr and James Harden as well, they steadfastly maintained their innocence. Defendant Officers compounded their initial misconduct by suppressing exculpatory evidence, including the coercion and fabrications that resulted in these false statements.

5.     Not only was there no "hard" evidence—fingerprints, serology, DNA or other physical evidence of any kind—linking Jonathan or any of the other teens to the rape and murder of Matthews, but DNA evidence at the time of trial *excluded* Jonathan and his co-defendants. However, the force of Defendant Officers' misconduct was enough to secure a conviction despite the objective evidence indicating innocence.

6.     Years later, Jonathan and his co-defendants were exonerated when new analysis and examination of the DNA evidence established that Willie Randolph was the source of the semen recovered in the rape kit collected during Ms. Matthews' autopsy. Randolph had no connection with Jonathan or any of his co-defendants.

7.     After the coerced "confessions" were proven false, the prosecution agreed to vacate Jonathan's conviction and dismiss all charges against him. On April 17, 2012, without opposition from the prosecution, Jonathan was granted a certificate of innocence from the State of Illinois.

8.     Through this civil rights action, Jonathan Barr, now a 35-year-old man, seeks accountability and compensation for the official misconduct and abuse of power that robbed him of the most formative and vibrant years of his life, when he would have been graduating from high school, pursuing a career, and starting a family.

## Jurisdiction and Venue

9.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

10.     This Court has jurisdiction over federal claims pursuant to 28 U.S.C. § 1331 and state law claims pursuant to 28 U.S.C. § 1367.

11.     Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district and Defendant Village of Dixmoor is a municipal corporation located here.  Additionally, the events giving rise to the claims asserted herein occurred within this judicial district.

## The Parties

12.     Plaintiff Jonathan Barr is 35 years old. At the time of the victim's murder, Jonathan was just 14 years old and a student at Rosa Parks Middle School in Dixmoor, Illinois.

13.     At all relevant times, Defendants Tasso J. Kachiroubas, John Meduga, Willie Davis, James Kizart, Jesse Garcia, and Richard Packert were officers with

the Illinois State Police employed by the State of Illinois; each of these defendants is being sued in his individual capacity

14.     At all relevant times, Defendants Joseph Falica, Jr., Michael R. Morgan, and Nicholas Graves were employed by the Village of Dixmoor with the Dixmoor Police Department and were acting within the scope of their employment. Each of these defendants is being sued in his individual capacity.

15.     Defendants Kachiroubas, Meduga, Davis, Kizart, Garcia, Packert, Falica, Morgan, Graves, As-yet Unknown Current or Former Employees of the Illinois State Police, and As-yet Unknown Current or Former Employees of the Village of Dixmoor, Illinois, are referred to collectively as the "Defendant Officers."

16.     The Defendant Village of Dixmoor is a municipal corporation under the laws of the State of Illinois.

## The Matthews Murder

17.     On November 19, 1991, 14-year-old Cateresa Matthews disappeared on her way home from her grandmother's house, where she had gone after school.

18.     Tragically, Ms. Matthews was raped and murdered in a grassy field near I-57 in Dixmoor by Willie Randolph, a 33-year-old convicted sex offender who lived nearby and had only recently been released from prison and was under the supervision of parole.

19.     The evening Ms. Matthews disappeared, her mother contacted the Harvey and Dixmoor police departments to report that her daughter was missing.

20.     Three days later, on November 22, 1991, Willie Randolph called the
Dixmoor Police Department to report that he had seen a body in a field near
Frank's Pizza on Western Avenue in Dixmoor, a few blocks from Ms. Matthews'
grandmother's house.  There is no indication in the file that Defendant Officers
investigated this call at the time.

21.     On December 8, 1991, 19 days after Ms. Matthews disappeared and 16
days after Randolph called the Dixmoor police, Ms. Matthews' body was discovered
by a passerby in the grassy field near I-57, not far from her grandmother's and
Frank's Pizza.  She was naked from the waist down and had been shot in the
mouth.

22.     The Illinois State Police and the Dixmoor police jointly investigated
Ms. Matthews' murder.   In keeping with standard police practices, Defendants
withheld many details about the murder from the public so that they could use
these details to test the veracity of any eventual confession.  These details included
the precise position of Ms. Matthews' body, the clothing she was wearing (and what
clothing had been taken off her body) and the specific location of her injuries.

23.     In the immediate aftermath of the murder, Defendant Officers,
including Kachiroubas and Morgan, interviewed friends, relatives, and classmates
of Ms. Matthews.  They learned no information that implicated Jonathan Barr or
his eventual co-defendants.

### The True Killer and Rapist is not Pursued

24.     During the ensuing 10 months, during which Defendant Officers made no reported progress in the Matthews investigation, they either failed to develop information that would have established the guilt of true perpetrator Willie Randolph—a convicted rapist and serial violent offender from Dixmoor—or suppressed the information they found.

25.     Among the evidence that Defendant Officers ignored and/or suppressed was the fact that Randolph, a known violent sex offender, lived about a mile away from where Ms. Matthews was found.  Randolph, who had served time for rape, deviate sexual assault, and armed robbery, was paroled in 1991 not long before Ms. Matthews was raped and killed.  He reported his address as 1809 W. 142nd Street in Dixmoor. Randolph was known to Defendant Officers, including Deputy Chief Morgan.

26.     Randolph, who was nearly 20 years older than Ms. Matthews, had previously used the exact same field where Ms. Matthews was raped and murdered to rape another young teen.  He also had a history of other violent assaults on young women.

27.     Randolph had also placed a call to the Dixmoor Police Department on November 22, 1991—three days after Ms. Matthews disappeared—reporting that there was a body in a field by Frank's Pizza in Dixmoor, near where her body was found two weeks later.  Defendant Officers, including Kachiroubas, received a tape

recording of this call on December 20, 1991, but either failed to investigate this call or suppressed the evidence they uncovered linking this call to Randolph.

28.     On March 8, 1992, when still no arrests had been made in Ms. Matthews' murder and rape, the Dixmoor Police Department arrested Randolph for possession of crack cocaine after he was found wandering through the street disrupting traffic about a block from his home—again, not far from where Ms. Matthews' body was found. On information and belief, the arresting officers ran his criminal history, revealing his past convictions as a violent sex offender and his parole date shortly before Ms. Matthews disappeared.

29.     On May 29, 1992, as Randolph was waiving a revolver, then firing the revolver, and shouting in the street, the nearby Calumet Park Police Department arrested him.  Randolph was subsequently convicted of unlawful use of a weapon and sentenced to four years in prison.

30.     None of this information was ever disclosed to Plaintiff Jonathan Barr or his co-defendants before their criminal trials.

31.     In the years that followed, Randolph was arrested for assaulting his niece and was arrested and convicted for aggravated assault with a deadly weapon after he attacked his girlfriend with a knife.  He was later arrested for several drug offenses and residential burglaries.

### The False Case Against Plaintiff

32.     At the time of Ms. Matthews' murder, Plaintiff Jonathan Barr was 14 years old and living in Dixmoor with his parents and two brothers.  He was a

student at Rosa Parks Middle School, did not know true perpetrator Willie Randolph, and had nothing to do with Ms. Matthews' disappearance or murder. He and Ms. Matthews had been friends, often walking to school together with a group of other children.

33. At some point in the course of their investigation, the Defendant Officers learned that, during a previous summer, Jonathan's brother (and eventual co-defendant) James Harden had dated Ms. Matthews. Despite the lack of evidence linking James to the crime, the Defendant Officers focused their attention on him and, by association, his brother Jonathan.

34. Several months after Ms. Matthews' body was found, Defendant Officers picked up seven or eight of the neighborhood boys, including Jonathan and James. The boys were taken to the Dixmoor Police Station and questioned separately about the murder by Defendant Officers. Defendant Officers did not notify the boys' parents of these interviews and the parents were not present. Both Jonathan and James truthfully insisted that they knew nothing about the murder and assault. Defendant Officers did not memorialize these interviews in any police reports, and their later police reports intentionally omit any references to these contacts and the exculpatory statements made by Jonathan and James.

35. Several times during this time frame, Defendant Officers picked up Jonathan and drove him around so that he would be seen by others riding in the police car. When questioned about the murder, Jonathan consistently—and truthfully—told Defendants that he did not know anything about it.

9

36.     During the 10 months after Ms. Matthews' body was found, Defendant Officers routinely picked up and questioned teenage boys from the area without notifying their parents and without documenting the interviews.  Several of the other eventual co-defendants, including Shainne Sharp, were picked up for questioning during this time period.  Each insisted that he knew nothing about the killing and that none of the boys eventually charged with the crime knew anything about the murder.  Defendants did not memorialize these interviews or the boys' insistence that they knew nothing about the killing.  Later police reports summarizing the investigation intentionally omit these interviews and the exculpatory statements made to Defendants.

37.     After several months of unsuccessful efforts with Jonathan and other teenagers, the Defendant Officers manufactured "evidence" that falsely implicated Jonathan.  This fabrication of evidence included, but was not limited to, unlawfully manipulating witnesses to falsely implicate Jonathan by means of outright coercion and improper suggestiveness, and feeding these witnesses nonpublic facts to include in their statements, all in violation of Plaintiff's constitutional rights. The means by which the Defendant Officers coerced these false statements implicating Jonathan were never disclosed to him. The Defendant Officers falsely reported that the nonpublic information in these statements had originated with the witnesses, and concealed that they had actually fed this information to the witnesses.  The Defendant Officers also fabricated other statements of witnesses in police reports and withheld other exculpatory evidence.

38.     At some point after Ms. Matthews' body was found, the Defendant

Officers took 15-year-old Keno Barnes, another schoolmate of Ms. Matthews, to the

Dixmoor police station. The Defendant Officers questioned Mr. Barnes, asking what

he knew about the murder; he told them that he knew nothing.  They pursued

additional questions specifically about Jonathan, James Harden, and Shainne

Sharp.  Mr. Barnes continued to tell them that he knew nothing about the murder.

The Defendant Officers never produced these statements to Plaintiff or the other

teenage defendants.

39.     In or around October 1992, Defendant Officers wrote a report falsely

asserting that Keno Barnes had made a statement to Defendant Officers, including

Kachiroubas, Meduga, Davis, and Falica, Jr. about Plaintiff Jonathan Barr and the

Matthews disappearance.  Specifically, Defendant Officers reported that Keno

Barnes said that Jonathan had told Keno that Jonathan saw Ms. Matthews get in a

car with Robert Veal, Robert Taylor, and some other boys, and that this was the last

time Jonathan ever saw Ms. Matthews.  This was a fabrication.  Jonathan never

said anything like this to Keno Barnes, and Keno Barnes did not provide this

information to the Defendant Officers.  Defendant Officers never disclosed to the

prosecutors or defense that they had fabricated this statement.

40.     On or about October 29, 1992, Defendant Officers, including Davis and

Kachiroubas, picked up 15-year-old Robert Veal from his home, cuffed and frisked

him, and took him to the Markham courthouse for questioning.  Defendants told

him that they wanted to question him about a murder that happened in Dixmoor.

41.     At the time of Robert Veal's interrogation, he was a mentally challenged and learning-disabled 15 year-old with an IQ of 56, who had difficulties with reading, writing, and comprehension that required him to be removed from public school and attend special education classes. He also suffered from anxiety disorders and was deaf in his right ear.

42.     That Robert Veal was a mentally challenged and learning-disabled 15-year-old was obvious to those who questioned him. But his intellectual and age-based limitations did not deter Defendant Officers, including Davis, Kachiroubas, Garcia, and Meduga, from questioning the teenager without a lawyer, parent, guardian, or any other representative during his entire unrecorded interrogation. Over the course of several hours, Defendant Officers yelled at Robert Veal, threatened him, and coerced him to implicate himself, Jonathan Barr, James Harden, Robert Taylor, and Shainne Sharp in the rape and murder of Ms. Matthews.

43.     As a result of this improper and undue pressure, inflicted on a mentally challenged 15-year-old, Robert Veal falsely implicated himself, Jonathan Barr, Robert Taylor, James Harden, and Shainne Sharp in the rape and murder of Ms. Matthews. The facts contained in that false confession were fed to him by the Defendant Officers, including Davis, Kachiroubas, Garcia, and Meduga. This included nonpublic facts about the crime, including: that Ms. Matthews was killed in a field near the expressway, that she was wearing a Chicago Bulls coat, which was pulled off during the assault, that her jeans were pulled off during the assault,

that she was shot in the face, and that she had been wearing a ring and bracelet. Defendant Officers falsely reported that these details had originated with Robert Veal, and suppressed that they had supplied this information to him, as well as the coercion they had used to obtain the statement.

44.     Defendant Officers handwrote a false statement that Robert Veal ultimately signed.

45.     Defendant Officers also fabricated a statement from Robert Veal that he saw a math book belonging to Cateresa Matthews in the car allegedly driven by James Harden on November 19, 1991.   Defendant Officers fabricated this statement and included it in a police report in order to further implicate Jonathan Barr after they searched his house on October 30, 1992, and found a junior-high level math book.   The book found in Jonathan's house was never linked to Ms. Matthews.

46.     Robert Veal was innocent of the Matthews murder.   He would never have falsely implicated Jonathan, himself, and the other teenage boys but for the Defendants' misconduct including coercion and fabrication of evidence.

47.     Later on the day of October 29, 1992, then 15-year-old Robert Taylor was interrogated by Defendant Officers, including Kizart, Davis, Garcia, and Meduga, under similar circumstances to the interrogation of Robert Veal. Defendant Officers physically abused, yelled at, threatened, and coerced Robert Taylor into making a statement that falsely implicated himself, Jonathan Barr, James Harden, Shainne Sharp, and Robert Veal in the crime.

48.     As a result of this improper and undue pressure, inflicted on this 15-year-old, Robert Taylor falsely implicated himself and the others in the crime.  The facts contained in the confession were fed to him by Defendant Officers, including Kizart, Davis, Garcia, and Meduga.

49.     Robert Taylor was innocent of the Matthews murder.  He would never have falsely implicated Jonathan, himself, and the other teenage boys but for the Defendants' misconduct.

50.     To further build the false case against Jonathan Barr and James Harden, Defendant Officers, including Davis, Packert, Kachiroubas, and Falica, coerced and fabricated a false statement from Shainne Sharp on or about October 30, 1992, implicating himself, Jonathan Barr and others in Ms. Matthews' rape and murder.  Mr. Sharp was 17 years old at the time, and throughout the interrogation, the Defendant Officers refused to allow him to call his mother, grandmother, or an attorney. Defendant Officers threatened Shainne Sharp and improperly coerced him into implicating himself, Jonathan, and the others.

51.     As a result of this improper and undue pressure inflicted on him, Shainne Sharp signed a statement which falsely implicated himself and the others in the crime.  The facts contained in the confession were fed to him by Defendant Officers, including the description of the field where the rape and murder occurred and that Ms. Matthews had been shot in the face.

52. Shainne Sharp was innocent of the Matthews murder. He would never have falsely implicated Jonathan, himself, and the other teenage boys but for the Defendants' misconduct.

53. Defendant Officers failed to disclose that the statements of Robert Veal, Robert Taylor, and Shainne Sharp were coerced and failed to disclose the means employed to coerce these statements. They also failed to disclose that the facts in the statements were fed to Mr. Veal, Mr. Taylor, and Mr. Sharp, and that the statements were fabricated; instead, they falsely represented that the details in the statements had originated with the witnesses.

54. Furthermore, in the months before his arrest, Shainne Sharp was questioned multiple times about Ms. Matthews' death during meetings with Officer Defendants including Graves and Kachiroubas. In these interviews, Shainne Sharp denied knowing anything about the crime and did not implicate Jonathan or his co-defendants. The Defendant Officers' police reports intentionally omit any reference to these exculpatory statements.

55. Based on this fabricated evidence, Plaintiff and his co-defendants were prosecuted for the Matthews rape and murder.

56. Defendant Officers also sought, unsuccessfully, to coerce and/or fabricate a statement from Jonathan Barr and James Harden. They interrogated them, separately, outside the presence of their parents or lawyers, and without reading them their rights.

57.     During Defendant Officers' interrogation of Jonathan, for example, he was handcuffed to a wall, hit on the back of the head and instructed to tell them what had happened to Ms. Matthews.  When Jonathan truthfully denied knowing anything, Defendant Officers insisted he tell them what had happened, yelling and screaming at him.  They told him—falsely—that his brother James had confessed and implicated him.  Defendant Officers then showed Jonathan disturbing crime scene and autopsy photographs of Ms. Matthews.

58.     Although Jonathan Barr and James Harden had never told them anything about the crime, Defendant Officers prepared a multi-page handwritten statement for each of them and put the statements in front of them, telling each of them that if they signed it, they could go home.  Defendant Officers would not let them read the statements.  Despite Defendant Officers' coercive tactics and their young age, Plaintiff Jonathan Barr and his brother James Harden, remarkably, were able to stand firm.  They refused to touch the statements, let alone sign them. They consistently and truthfully maintained their innocence of this horrific crime at all times.

### Forensic Evidence Excludes Plaintiff

59.     No physical or forensic evidence ever linked Jonathan Barr or any of his co-defendants to the crime.  Rather, the physical evidence *excluded* the five teenagers.

60.     In October 1993, a forensic scientist from the Illinois State Police compared the numerous hairs found on the victim's body and clothes and did not

find a single match with Jonathan Barr, or any of the other co-defendants. For a number of the hairs, the victim, too, was excluded as a source This information was reported to Defendant Officers, including Kachiroubas.

61.     Additionally, a bullet casing was found on Ms. Matthews' chest and a bullet was recovered from her body. Neither was ever linked to Jonathan or any of his teenage co-defendants.

62.     In early 1994, the Illinois State Police crime lab tested sperm on the vaginal and rectal swabs from the victim. Although the statements attributed to Robert Veal, Robert Taylor, and Shainne Sharp collectively claimed that Ms. Matthews had been vaginally raped by all five co-defendants, the DNA testing on the sperm identified a single source male DNA profile. More importantly, the profile excluded Jonathan and all of his co-defendants as the source of the semen. In June 1994, the lab made a full report of the exclusion to Defendant Kachiroubas and other Defendant Officers.

63.     Defendant Officers ignored this critical evidence indicating that all of the teenagers were innocent of the Matthews rape and murder, and that the statements from Sharp, Veal and Taylor were all false. They either failed to investigate other leads—such as true perpetrator Willie Randolph, a convicted sex offender who had recently been paroled into the neighborhood where Ms. Matthews' body was found, was arrested for possession of a firearm months later, and had called 911 to report the body—or suppressed the exculpatory information they uncovered.

17

64. Most importantly, despite this exonerating evidence, Defendant Officers continued to misrepresent the circumstances under which they had obtained the statements from Sharp, Veal and Taylor, concealing the coercion they had used. They also falsely represented that the details about the crime, including nonpublic details, originated with Sharp, Veal and Taylor, when in reality these details had been supplied by Defendant Officers.

## The Wrongful Conviction

65. In January 1997, Jonathan Barr stood trial for the rape and murder of Cateresa Matthews.

66. The false, fabricated, and coerced testimony of Robert Veal and Shainne Sharp was the only evidence that was presented against Jonathan at his trial.

67. At trial, the prosecutors highlighted the details in Veal and Sharp's statements. The prosecution specifically argued that the Defendant Officers did not provide any information about the crime to Veal or Sharp, and that therefore these nonpublic details were "like mini lie detectors, mini truth finders" that proved that Robert Veal and Shainne Sharp "were there with" Jonathan Barr because "if they weren't there, they wouldn't know that."

68. No physical evidence ever linked Jonathan to the crime. The prosecution rested entirely on these false and fabricated statements that were, in fact, contradicted by the physical evidence. Any additional evidence that would have undermined those statements would have changed the outcome of Plaintiff's trial.

69.     As a proximate result of the above-described misconduct on the part of the Defendant Officers, the jury convicted Jonathan of the rape and murder of Ms. Matthews.  But for the Defendant Officers' misconduct, Jonathan would have been neither prosecuted nor convicted.

70.     On February 13, 1997, Plaintiff was sentenced to 85 years in prison.

## Plaintiff's Exoneration

71.     Throughout his prosecution and incarceration, Jonathan Barr maintained his innocence and pursued all possible avenues to prove it.

72.     In March 2005, Jonathan filed a motion for post-conviction DNA testing.  It was rejected by the same judge who had overseen his trial.

73.     Four years later, James Harden filed a new motion for post-conviction DNA testing; Jonathan and Robert Taylor soon joined that motion, which was granted.

74.     Cellmark Laboratories in Dallas, Texas conducted the DNA testing and obtained a single male DNA profile from the vaginal swab extracts collected from Ms. Matthews post-mortem.

75.     DNA testing excluded Jonathan Barr and the other four persons supposedly involved in the crime. Despite the "confessions" claiming that all five co-defendants had intercourse with the victim, the testing revealed only a single male DNA profile.

76.     In March 2011, the Illinois State Police submitted the DNA profile to the Combined DNA Index System (CODIS) database, which returned a match to the

DNA profile of Willie Randolph, the convicted sex offender with a long and violent criminal history who at the time of the murder had recently been paroled from prison to the neighborhood where the victim's body was found.

77.     On November 3, 2011, the Cook County State's Attorney's Office requested the Cook County Circuit Court to vacate the convictions of Jonathan Barr, James Harden, and Robert Taylor. The court vacated all of these convictions and the prosecution then entered a *nolle prosequi* as to the charges. Shortly thereafter, the court also vacated the convictions of Robert Veal and Shainne Sharp.

78.     On April 17, 2012, the State of Illinois granted Jonathan a certificate of innocence, without objection from the prosecution.

## Plaintiff's Damages

79.     The actions of Defendant Officers caused Jonathan Barr to spend over 18 years in prison for a crime he did not commit. Now a 35-year-old man, he must attempt to make a life for himself outside of prison without the benefit of nearly two decades of life experiences—including his adolescence and young adulthood, high school and early work experience, relationships and family-building —which normally equip adults for building a life.

80.     Jonathan was taken from his family when he was just 15 years old. During his incarceration, Jonathan missed out on the ability to attend and graduate from high school with his friends, to share holidays, births, funerals, and other life events with loved ones, the opportunity to have girlfriends, to fall in love, to marry, and to pursue a career, and the fundamental freedom to live his life as an

autonomous human being. While he was incarcerated, his father and mother, and grandmother, died, and he was denied the opportunity to attend their funerals.

81. The unlawful, intentional, willful, deliberately indifferent, reckless and/or bad faith acts and omissions of Defendant Officers proximately caused Jonathan, *inter alia*, the following injuries and damages: continuous incarceration for over 18 years, personal physical injury, pain and suffering, severe mental anguish, loss of family relationships, severe psychological damage, loss of educational opportunity, loss of professional opportunity, loss of income, humiliation, indignities and embarrassment, degradation, permanent loss of natural psychological development, restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, movies, use of computers and cell phones, and travel, for which he is entitled to monetary relief.

### Count I – 42 U.S.C. § 1983
### Violation of Due Process

82. Each paragraph of this Complaint is incorporated as if restated fully herein.

83. As described more fully above, all of the Defendant Officers, while acting individually, jointly, and/or in conspiracy, as well as under color of state law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

84.     In the manner described more fully above, the Defendant Officers individually, jointly, and/or in concert and in conspiracy, fabricated false reports and other evidence which caused the conviction of Plaintiff, including specifically the statements attributed to Robert Veal, Shainne Sharp, Robert Taylor and Keno Barnes; this includes fabricating that nonpublic information about the crime had originated with these witnesses, when it had actually been fed to them by the Defendant Officers.

85.     In the manner described more fully above, the Defendant Officers individually, jointly, and/or in concert and in conspiracy,  deliberately withheld exculpatory and impeachment evidence—such as the police coercion and fabrication of witness testimony, prior statements by these witnesses contradicting their later statements and/or testimony, and the fact that the nonpublic information about the crime contained in the inculpatory witness statements had been provided by the Defendant Officers, not the witnesses.  By failing to disclose this information, Defendant Officers violated their clearly established duty to report all material exculpatory and impeachment information to prosecutors.

86.     Absent Defendant Officers' misconduct, the prosecution of Plaintiff could not and would not have been pursued and he would not have been convicted.

87.     The Defendant Officers' misconduct directly and proximately resulted in the unjust and wrongful criminal conviction of Plaintiff and his wrongful imprisonment, thereby denying him his constitutional right to a fair trial, in

violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

88.     As a direct and proximate result of this violation of his constitutional right to a fair trial, Plaintiff suffered the injuries set forth above, including but not limited to loss of liberty, personal physical injury and emotional distress.

89.     Defendant Officers committed these acts intentionally, and with willful indifference to Plaintiff's clearly established constitutional rights. .

## Count II – 42 U.S.C. § 1983
### Failure to Intervene

90.     Each paragraph of this Complaint is incorporated as if restated fully herein.

91.     As set forth above, one or more Defendant Officers had opportunities to intervene on behalf of Plaintiff and prevent the constitutional violations described herein, but due to their intentional conduct and/or reckless or deliberate indifference, declined or refused to do so.

92.     As a direct and proximate result of the Defendant Officers' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered the injuries set forth above, including pain and emotional distress. These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

93.     The misconduct described in this Count was committed intentionally, willfully, and/or with reckless or deliberate indifference to Plaintiff's clearly established constitutional rights.

## Count III – 42 U.S.C. § 1983
## Conspiracy to Deprive Constitutional Rights

94.     Each paragraph of this Complaint is incorporated as if restated fully herein.

95.     After the murder of Ms. Matthews, the Defendant Officers agreed among themselves and with other individuals to act in concert in order to deprive Plaintiff of his constitutional rights, including his rights to due process and to a fair trial, as set forth above.

96.     Additionally, before and after Plaintiff's conviction, the Defendant Officers further conspired to deprive Plaintiff of exculpatory information to which he was lawfully entitled and which would have led to either his not being charged, his acquittal, or his more timely exoneration.

97.     In this manner, the Defendant Officers, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

98.     In furtherance of the conspiracy, each of the co-conspirators engaged in and facilitated numerous overt acts, including but not limited to those set forth above – such as fabricating evidence, withholding exculpatory evidence, coercing false confessions, committing perjury during hearings and trials – and was an otherwise willful participant in the joint activity.

99.     The misconduct described in this Count was undertaken with malice, willfulness, and/or reckless indifference to Plaintiff's rights.

100.  As a direct and proximate result of Defendants' conspiracy and actions in furtherance of the conspiracy, Plaintiff was wrongly convicted and imprisoned for over 18 years and suffered other grievous and continuing damages and injuries as set forth above.

### Count IV – 42 U.S.C. § 1983
### Liability of Supervisors

101.  Each paragraph of this Complaint is incorporated as if restated fully herein.

102.  The unfair trial, wrongful conviction, and continued wrongful detention of Plaintiff Jonathan Barr were caused by the deliberate indifference and recklessness of supervisory defendants, including but not limited to Michael Morgan and Nicholas Graves, when they failed to adequately train, supervise, and discipline the individual Defendant Officers.

103.  Specifically, these supervisory defendants were personally involved in the case against Jonathan Barr and knew or, in the absence of their deliberate indifference and recklessness, should have known of their subordinates' unconstitutional actions and related misconduct in the case.

104.  Furthermore, these supervisory defendants failed to supervise the individual defendants in constitutionally adequate law enforcement practices, particularly those which concerned interviews of suspects and witnesses and production of exculpatory evidence, thereby encouraging and/or permitting these employees and other defendants to coerce and fabricate false inculpatory evidence

and to withhold exculpatory and impeachment evidence, which caused the constitutional deprivations suffered by Plaintiff.

105.    These interview techniques, failures in producing exculpatory evidence, fabrications and other investigative procedures were contrary to accepted methods used by law enforcement agencies. The fact that that the defendant supervisors failed to train, supervise, and discipline their subordinates to ensure that they employed proper investigation procedures demonstrates deliberate indifference and reckless disregard for Plaintiff's constitutional rights.

106.    The personal involvement of the defendant supervisors, through their actions and omissions, proximately and directly caused the constitutional deprivations and grievous personal injuries suffered by Plaintiff, including the above-mentioned injuries and damages.

107.    The misconduct described in this Count was committed intentionally, willfully, and/or with reckless or deliberate indifference to Plaintiff's clearly established constitutional rights.

### Count V – 42 U.S.C. § 1983
### Monell Liability

108.    Each paragraph of this Complaint is incorporated as if restated fully herein.

109.    The misconduct described above by the individual and supervisory Defendant Officers was undertaken pursuant to the policy and practice of the Village of Dixmoor in that Dixmoor Police Department employees and agents regularly failed to disclose exculpatory evidence to criminal defendants, pursued

wrongful convictions through profoundly flawed investigations and coerced testimony, and otherwise violated due process in a similar manner to that alleged herein. The above-described widespread practices, which were so well-settled as to constitute *de facto* policy in the Dixmoor Police Department, were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

110. Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because the Village of Dixmoor declined to implement sufficient training and/or any legitimate mechanism for oversight or punishment.

111. Additionally and/or alternatively, the misconduct described in this Count was undertaken pursuant to the policy and practice of the Village of Dixmoor in that the constitutional violations committed against Mr. Barr were committed with the knowledge, approval, and or participation of person(s) with final policymaking authority for the Village of Dixmoor, including without limitation Chief Nicholas Graves and Deputy Chief Michael Morgan and/or undertaken by a municipal agent with final policymaking authority for the Village of Dixmoor.

112. The customs and practices set forth above were the moving force behind the numerous constitutional violations in this case, and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

## Count VI – State Law Claim
## Malicious Prosecution

113.   Each paragraph of this Complaint is incorporated as if restated fully herein.

114.   Defendant Officers, despite knowing that probable cause did not exist to arrest and prosecute Jonathan Barr for the rape and murder of Cateresa Matthews, acted individually, jointly, and/or in concert and in conspiracy, to cause Plaintiff to be arrested and prosecuted for that crime.  Defendant Officers made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings.

115.   Specifically, Defendant Officers were aware that, as described more fully above, no true or reliable evidence implicated Plaintiff in the Matthews rape/murder, all inculpatory evidence was coerced and fabricated, and forensic evidence indicated Plaintiff's innocence.  Furthermore, Defendant Officers intentionally withheld from and misrepresented to prosecutors and the grand jury facts that further vitiated probable cause against Plaintiff, as set forth above, and failed to investigate evidence which would have led to the actual assailant. Defendant Officers performed the above-described acts deliberately, with reckless disregard, and with malice.

116.   On November 3, 2011, the prosecution terminated in Plaintiff's favor when his conviction was vacated and the charges dismissed.  On April 17, 2012, he was granted a Certificate of Innocence by the State of Illinois.

117.    As a direct and proximate result of this misconduct, Plaintiff sustained, and continues to sustain, injuries as set forth above, including pain and suffering.

### Count VII – State Law Claim
### Intentional Infliction Of Emotional Distress

118.    Each paragraph of this Complaint is incorporated as if restated fully herein.

119.    The acts and conduct of the Defendant Officers as set forth above were extreme and outrageous. The Defendant Officers' actions were rooted in an abuse of power or authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

120.    As a direct and proximate result of the Defendant Officers' actions, Plaintiff suffered and continues to suffer severe emotional distress.

### Count VIII – State Law Claim
### Civil Conspiracy

121.    Each paragraph of this Complaint is incorporated as if restated fully herein.

122.    As described more fully in the preceding paragraphs, the Defendant Officers, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

123.   In furtherance of the conspiracy, the Defendant Officers committed overt acts and were otherwise willful participants in joint activity including but not limited to the malicious prosecution of Plaintiff and the infliction of emotional distress upon him.

124.   As a direct and proximate result of the Defendant Officers' conspiracy, Plaintiff suffered damages, including severe emotional distress and anguish, as is more fully alleged above.

### Count IX – State Law Claim
### Respondeat Superior

125.   Each paragraph of this Complaint is incorporated as if restated fully herein.

126.   In committing the acts alleged in the Counts VII, VIII and IX, Defendant Officers Joseph Falica, Jr., Michael R. Morgan, Nicholas Graves, and As-yet Unknown Current and Former Employees of the Village of Dixmoor were members of, and agents of, the Village of Dixmoor, acting at all relevant times within the scope of their employment.

127.   Defendant Village of Dixmoor is liable for the acts of these Defendant Officers which violated state law under the doctrine of respondeat superior.

### Count X – State Law Claim
### 745 ILCS 10/9-102
### Claim Against Defendant Village of Dixmoor

128.   Each paragraph of this Complaint is incorporated as if restated fully herein.

129.    Defendant Village of Dixmoor was the employer of defendants Falica, Morgan, and Graves, at all times relevant to this complaint.

130.    Defendants Falica, Morgan, and Graves committed the acts alleged above under color of law and in the scope of their employment as employees of the Village of Dixmoor.


WHEREFORE, Plaintiff JONATHAN BARR respectfully requests that this Court enter judgment in his favor and against Defendants, Illinois State Police Officers TASSO J. KACHIROUBAS, JOHN MEDUGA, WILLIE DAVIS, JAMES KIZART, JESSE GARCIA, RICHARD PACKERT, Former Dixmoor Lt. JOSEPH FALICA, JR., Former Dixmoor Deputy Chief of Police MICHAEL R. MORGAN, Former Dixmoor Chief of Police NICHOLAS GRAVES, VILLAGE OF DIXMOOR, As-yet Unknown Current or Former Employees of the Illinois State Police, and As-yet Unknown Current or Former Employees of the Village of Dixmoor, Illinois, awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate.


## JURY DEMAND

Plaintiff, JONATHAN BARR, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.


Dated: October 17, 2012

Respectfully submitted,

/s/ Peter Neufeld,                        /s/John L. Stainthorp
Peter Neufeld, Nick Brustin,              John L. Stainthorp, G. Flint Taylor
Anna Benvenutti Hoffmann,                 Jan Susler
Alexandra Lampert                         People's Law Office
Neufeld Scheck & Brustin LLP              1180 N. Milwaukee
99 Hudson Street, 8th Floor               Chicago, IL 60642
New York, New York 10013                  773-235-0070
212-965-9081

**Attorneys for Plaintiff Jonathan Barr**